**In the United States District Court**
**For the Southern District of Texas**
**Houston Division**

| | | |
|---|---|---|
| **Alan J. Atkinson** | § | |
| | § | |
| **v.** | § | |
| | § | **Civil Action No. 4:20-cv-001892** |
| **Mayor Sylvester Turner, the City of** | § | |
| **Houston, Texas, and Houston Housing** | § | |
| **Authority** | § | *Consolidated with* |
| | | |
| **Alan J. Atkinson** | § | |
| | § | |
| **v.** | § | |
| | § | **Civil Action No. 4:20-cv-001895** |
| **The City of Houston, Texas, Tom** | § | |
| **McCasland and Houston Housing** | § | |
| **Authority** | § | |

---

**Plaintiff's First Amended Complaint[1]**

---

[1]     During the Court's Rule 16 conference on June 30, 2020 in Case No. 4:20-CV-001892, the Court consolidated Case No. 4:20-CV-001892 with Case No. 4:20-cv-001895, and ordered Atkinson to replead his cases into one complaint but, at the same time, noted that "this process does not license amendment." [Docket Entry No. 16]. Given the Court's order, Atkinson has for the most part repeated the allegations from his Original Petition made the basis of Defendant's removal in Case No. 4:20-cv-1892. If permitted, Atkinson would have dropped all claims against the City of Houston and HHA, substituted their agents in their official capacities, and asserted a federal claim, all as Atkinson requested in his Response to Defendants' Motion to Dismiss in that case. [See Docket Entry Nos. 9 & 10]. But given the Court's statement that the order to combine was not a license for leave to amend where leave was required, Atkinson has left his claims substantially as they were at the time of removal (but has, for brevity, edited certain language, omitted many of the exhibits, changed injunction terminology now that the case is in federal court, and dropped his request for attorney's fees since that is not an available remedy under the federal Declaratory Judgment Act). There are no new causes of action in the portion of the First Amended Complaint that addresses the events made the basis of Atkinson's pleadings as they existed in Case No. 4:20-cv-001892 as it existed before consolidation.

As for the claims in the petition made the basis of Defendants' removal in Case No. 4:20-cv-1895, Atkinson notes that he still retains the absolute right to amend without the need to obtain leave of court. FED. R. CIV. P. 15(a)(1)(B) provides that a party may amend its pleading once as a matter of course where, as here, the pleading is one to which a responsive pleading is required so long as the amendment is filed 21 days after service of a responsive pleading or 21 days after service of a Motion under Rule 12(b)…, whichever is earlier.". No defendant filed an answer to Atkinson's pleadings in that case. Instead, the first filed pleading in that case was HHA's Rule 12(b) Motion filed on June 19, 2020. 21 days after June 19, 2020 is July 10, 2020, and this First Amended Complaint is being filed by that date. Accordingly, as to the claims made the basis of Atkinson's case that Defendants removed and the Clerk assigned Case No. 4:20-cv-001895, Atkinson has amended his pleadings to: (a) add new claims which provide the Court with federal question subject matter jurisdiction over the issues in that case; (b) omitted some claims against the City of Houston and HHA and, in their stead added those claims against the proper defendants to those claims, and dropped his request for attorney's fees since that is not an available remedy under the Federal Declaratory Judgment Act.

# Claims in 4:20-cv-001892 – Standard Jensen Project

## Parties

1.      Plaintiff **Alan J. Atkinson** is an individual resident of the City of Houston, Texas who pays property taxes not only to the City of Houston, and Harris County, but also to the United States Treasury.

2.      Defendant **Sylvester Turner** (Turner or the Mayor) is an individual who resides in Harris County, Texas and who is being sued in his official capacity only.   Issuance of summons is not requested at this time.

3.      Defendant **City of Houston** is a Texas Home Rule Municipality.   Issuance of summons is not requested at this time.

4.      Defendant **Houston Housing Authority** (HHA) is a public corporation created under the U.S. Housing Act of 1937 and Chapter 392 of the Texas Local Government Code. Issuance of summons is not requested at this time.

## Jurisdiction & Venue & Conditions Precedent

5.      By virtue of the federal question claims asserted *infra* related to the EaDo 800 Lofts Project outlined below, this Court now has federal question subject matter jurisdiction over the case.   Because the Court has not "licensed amendment", Atkinson has not asserted any claims arising under federal law to address the Standard Jensen Project (though he would if permitted leave to amend).   The Court has supplemental jurisdiction under 28 U.S.C. § 1367 over the state law *ultra vires* claim Atkinson asserts with respect to the Standard Jensen Project.

6.      The Court has personal jurisdiction over HHA and the City since they are Texas governmental entities and, in Mayor Turner's case, a resident of Texas and because they have purposefully established minimum contacts with the State of Texas sufficient to subject them to

personal jurisdiction consistent with due process under the Fifth and/or Fourteenth Amendments to the United States Constitution, and the Court's exercise of jurisdiction over Defendants does not offend traditional notions of fair play and substantial justice.

7.     Venue is proper in this division and district under 28 U.S.C. § 1391(b) because (a) Defendants either reside in or conduct a substantial amount of business in this district; (b) a substantial part of the events giving rise to the claims occurred in this division and district; and (c) the property that is the subject of the action is situated in this division and district.

8.     All necessary conditions precedent to the claims regarding the Standard Jensen Project have occurred, been waived or are futile.

## Standing

9.     Atkinson has standing to bring the claims about the Standard Jensen Project under *Andrade v. Venable*, 372 S.W.3d 134 (Tex. 2012) and its related predecessor cases.  Atkinson timely pays property taxes to the City of Houston by virtue of his ownership of a currently undeveloped three-acre plot of land at 400 Jensen Drive, Houston, Texas, which is roughly 200 yards from the proposed site for the Standard Jensen Project.  Defendants have indicated that they intend to spend public funds illegally to purchase approximately 11.43 acres of land on Buffalo Bayou located at the southwest corner of Jensen Drive and Clinton Drive (identified as 100 Jensen Drive and 2701 Foote Street) in Houston, Harris County, Texas 77020 (the Property) for the creation of a public housing project in Houston, Texas, called the Standard Jensen Project, without going through the process required to obtain the effective, informed consent of the United States Department of Housing and Urban Development (HUD).  Specifically, on behalf of the City, Turner caused to be published a Request for Release of Funds Notice dated March 25, 2020, indicated the City intends to ask HUD for approval from HUD to spend $15,000,000 of public funds – clearly not a *de minimis* amount – to purchase the Property for

HHA's ultimate benefit and use upon which to locate public housing which will be unsuitable for public housing under federal law.  At the same time, HHA, Turner and the City have concealed, failed to disclosure or are misrepresenting material facts that would result in HUD's disallowance of the land purchase, if Defendants had fully informed HUD of the facts disclosed in this lawsuit.  In addition, HHA, Turner and the City have not fully complied with federal law in seeking HUD's consent to use these funds.

10.     The $15,000,000 (the Illegal Expenditure) constitutes public funds because it comprises a portion of HUD Section 18 funds generated from the recent sale of Clayton Homes, a HUD-assisted HHA project which was developed, acquired or assisted with funds paid out by HUD pursuant to the U.S. Housing Act of 1937.  Accordingly, HUD's approval must be obtained before such funds can be used in any way.  Upon information, belief, and the statements in the City's "Finding of No Significant Impact" (FONSI) notice, the City and Turner have either already requested permission from HUD to make the Illegal Expenditure, or are days away from doing so, without obtaining the informed consent of HUD.  But for Turner and the City's desire to make the Illegal Expenditure to benefit HHA, the public funds would not be expended at this time.

**Ripeness**

11.     The claims relating to the Standard Jensen Project are ripe.  The City and Turner gave notice in March 2020 that in April 2020, they intended to seek permission from HUD to purchase the Property and make the Illegal Expenditure, and to date, that public notice has not been withdrawn or amended.  Although Plaintiff Atkinson has informed HHA, the City and Turner of the material facts that show why the Property is not suitable for this Project, both Turner and the responsible officials at the City and HHA have simply ignored his objections and the information he has provided, while failing to comply with the procedural requirements set

forth in 24 C.F.R. § 58.43(c), 24 C.F.R. § 58.47(a)(2), 24 C.F.R. §58.47(b).   These actions constitute ongoing violations of federal law.

## No Governmental or Sovereign Immunity

12.     As explained in *City of El Paso v. Heinrich*, the *ultra vires* exception allows a plaintiff to sue a state official[2] in his official capacity, thereby binding the State through its agent, for prospective injunctive and/or declaratory relief to restrain the official from violating statutory or constitutional provisions.   284 S.W.3d 366, 369-76 (Tex. 2009) ("it is clear that suits to require state officials to comply with statutory or constitutional provisions are not prohibited by sovereign immunity, even if a declaration to that effect compels the payment of money"); *City of Houston v. Houston Mun. Employees' Pension Sys.*, 549 S.W.3d 566, 576 (Tex. 2018); *City of Galveston v. CDM Smith, Inc.*, 470 S.W.3d 558, 563–64 (Tex. App.—Houston [14th Dist.] 2015, pet. denied) ("A suit asserting that a government officer 'acted without legal authority' and seeking to compel the official 'to comply with statutory or constitutional provisions' is an ultra vires suit" "not barred by governmental immunity….").

## Background Facts

A.     **Receipt of HUD Funds and The Environmental Review Process.**

13.     Like all other federal agencies, HUD is subject to the procedural requirements of the National Environmental Policy Act of 1969 (NEPA).   NEPA requires agencies to consider the impact to the environment when proposing to take major federal action.   Before taking such action, the agency has to prepare an Environmental Assessment (EA).   The EA determines whether the proposed federal action could cause significant environmental effects.   If the agency determines that the federal action will not have such an impact, certain procedural requirements

---

[2]     If permitted to amend, Atkinson would substitute Thiele and Snowden for the HHA.

kick in before the agency may take action.  The agency must issue and publish a FONSI notice and provide a period of time for the public to study the proposed action and offer comments.  If the agency gets comments back, it cannot ignore them.  It has to consider the comments and make modifications, if appropriate, in response to the comments, before it completes its environmental certification and before taking action.

14.     For federal public housing projects, federal law allows HUD to delegate all of its NEPA obligations to the local government that wants HUD financial assistance.  42 U.S.C. § 5304(g)(1); *Dickeyville Ass'n v. U.S. Dep't of Hous. & Urban Dev.*, 636 F. Supp. 362, 366 (D. Md. 1986) ("[U]nder § 5304, fulfillment of the primary obligations under NEPA shifts from the federal agency to the local recipient."); 24 C.F.R. §§ 58.01 to 58.77.  Therefore, because the City receives federal funds from HUD through various federal grants and programs, the City and its relevant officials are obligated to follow the procedures required by NEPA by undertaking the environmental review process and provide the studies to HUD that show that the location chosen for the new project is safe, free from contamination, and meets other federal standards for HUD-assisted public housing.  *See* 24 C.F.R. §§ 58.01 to 58.77.  In HUD parlance, the City is the "Responsible Entity" that has the NEPA obligations, while the local housing authority (in this case, the HHA) is termed the "Recipient."

15.     In completing the EA, the responsible entity must, among other things, identify all potential environmental impacts, whether beneficial or adverse, and the conditions that would change as a result of the project and complete all environmental review requirements necessary for the project's compliance with applicable authorities.  24 C.F.R. § 58.40.  The study must then conclude whether the project has a significant impact on the quality of the human environment.  24 C.F.R. § 58.40(g).  If after conducting the requisite environmental review, the responsible

entity determines that the project poses no significant impact, it must issue the FONSI notice, notify individuals and groups known to be interested in the activities, the local news media, appropriate local, State and Federal agencies and the HUD Field Office of its FONSI determination and then publish the FONSI notice in a newspaper of general circulation in the affected community and provide a public comment period of between 15-30 days.  24 C.F.R. § 58.43(a); 24 C.F.R. § 58.45.  If the responsible entity receives comments, it must consider the comments and make modifications, if appropriate, before it completes its environmental certification and before the recipient submits to HUD its Request for Release of Funds (RROF) to HUD.  24 C.F.R. § 58.43(c).  If, on the other hand, the responsible entity determines that its original findings are still valid but the data or conditions upon which they were based have changed, the responsible entity must affirm the original findings and update its environmental review records ("ERR") by including this re-evaluation and its determination based on its findings.  *Id.*

16.     The responsible entity is not the only entity with obligations in this process.  A recipient also has certain obligations.  When the recipient of HUD funds becomes aware of new circumstances and environmental conditions that may affect the project or have a bearing on its impact, such as concealed or unexpected conditions discovered during the implementation of the project or activity that is proposed to be continued, it must promptly inform the responsible entity of the new circumstances or environmental conditions so that the responsible entity can re-evaluate the findings before proceeding.  24 C.F.R. § 58.32(d)(2); 24 C.F.R. § 58.47(b)(3).

17.     In the absence of any receipt of objection to the contrary, HUD will assume the validity of the certification and RROF and will approve the request.  HUD may also disapprove a

certification and RROF if it has knowledge that the RROF and certification are inaccurate.  24 C.F.R. § 58.72.

**B.      The Sale of Clayton Homes**

18.      Clayton Homes is a HUD-assisted housing facility authorized by Section 18 of the U.S. Housing Act of 1937 tucked between Highway 59 and Buffalo Bayou north of Runnels Street in the northwest corner of the East End.  Nearly 40% of the units of Clayton Homes were flooded during Hurricane Harvey and were deemed "uninhabitable" by its owner, Defendant HHA.  Rather than rebuild the affected portion of Clayton Homes, HHA entered into an agreement with the Texas Department of Transportation (TxDOT) to sell the entire Clayton Homes project for a purchase price of $90,000,000.  TxDOT intends to acquire and demolish Clayton Homes to allow for an expansion of Interstate Highway 45, under the proposed North Houston Highway Improvement Project.  Because 100% of these funds come from the sale of a HUD-assisted project, HUD has control over the disposition and use of those funds and any expenditure of those funds requires advance approval from HUD.

19.      On March 25, 2020, Mayor Turner, on behalf of the City, issued a Combined FONSI/NOIRROF notice, providing notice that its Housing and Community Development Department would, on behalf of HHA, submit a request to HUD for the release of $15,000,000[3] from the proceeds of sale from the Clayton Homes project, so that HHA could purchase land from a private seller so that HHA could then, in conjunction with an affiliate of a private developer, Ojala Partners, LP, develop a new low income housing project that the City is calling "Standard Jensen Phase I and II" (the Standard Jensen Project).  [**Exhibit 1**].  The Standard

---

[3]      On April 21, 2020, the HHA Board passed Resolution 3161, which lowered the requested release of funds from $15,000,000 to $12,000,000, but also signaled HHA's intent to seek an additional $3,000,000 in the future.

Jensen Project is slated to be a mixed-income housing project with approximately 600 units in two multi-story buildings, along with a parking garage.

20.     To seek HUD's approval and release of the $15,000,000, HHA and Ojala have, upon information and belief, submitted and conspired to submit false statements about the suitability of the Property to the City, which has, through Mayor Turner, in turn repeated those false statements in its FONSI notice and to HUD.  These misrepresentations of fact are contained in: (a) a January 14, 2020 letter by ESE Partners (an accurate reproduction of which is attached as **Exhibit 2**); (b) a January 24, 2020, HUD Part 58 Environmental Review Record (Ojala Environmental Report) (an accurate reproduction of which is attached as **Exhibit 3**); (c) a January 23, 2020, East River Project Phases I and II HUD Noise Study (Ojala Noise Study) (an accurate reproduction of which is attached as **Exhibit 4**); and (d) a March 29, 2020, Environmental Assessment, Determinations and Compliance Findings for HUD-assisted Projects, 24 CFR Part 58 (COH Environmental Report) (an accurate reproduction of which is attached as **Exhibit 5**).

## C.     The Standard Jensen Project Fails HUD's Noise Standards set forth in 24 C.F.R. Part 51, Subpart B.

21.     The Noise Control Act of 1972, 42 U.S.C. § 4901, *et seq*., establishes a national policy to promote an environment for all Americans to live free from noise that jeopardizes their health and welfare.  The Act also establishes a means for effective coordination of Federal activities in noise control.  It is a crime for any "person" (defined by 42 U.S.C. § 4902(2) to include any officer, employee, department, agency, or instrumentality of any political subdivision of a State) to knowingly make any false statement, representation, or certification in any application, record, report, plan, or other document filed or required to be maintained under the Noise Control Act.  42 U.S.C. § 4912(c).

22.     HUD has incorporated the Noise Control Act in the EA process, promulgating regulations that "[g]enerally prohibit HUD support for new construction of noise sensitive uses on sites having unacceptable noise exposure."  24 C.F.R. § 51.100(a)(4).  Accordingly, entities like the City and HHA who wish to use HUD funds to construct affordable housing "must take into consideration the noise criteria and standards in the environmental review process and consider ameliorative actions when noise sensitive land development is proposed in noise exposed areas" and must "address deviations from the standards in their environmental reviews." 24 C.F.R. § 51.101(a)(2)(i).  "HUD assistance … is discouraged for projects with normally unacceptable noise exposure."  *Id.* at § 51.101(a)(3).  The acceptability standards that HUD uses are a Day/Night average sound level ("DNL") of less than 65 decibels, while anything between 65 and 75 decibels is considered "normally unacceptable and requires special approvals, environmental reviews and attenuation measures.  24 C.F.R. § 51.103(c).  Anything above 75 decibels is deemed unacceptable.  *Id.*

23.     Both HHA and Ojala knew as early as December 18, 2019 that the Property was impacted by serious noise issues.  Accordingly, Ojala commissioned a noise study, as required by the Noise Control Act and HUD regulations, and submitted it to HUD on or about January 23, 2020.  The January 23, 2020 Ojala Noise Study calculated the DNL to be 74.7 dBA — "just below the HUD noise requirement."  [**Exhibit 4**, at p. 9].  The legally required Notice from the City of Houston and Mayor Turner incorporates this false report, claiming that "no outside gathering areas have noise levels exceeding 65 DNL."  [**Exhibit 1**].  Neither of these assertions is accurate, and these false conclusions can only be reached if aided by the deliberate omission of, or misrepresentations about, material facts because the noise levels at the site of the Project will range between 77-80 decibels, well beyond the 75 dBA limit.

24.     The Ojala Noise Study is fatally defective because it calculated Interstate 69 noise impact at the present location of the freeway, which is currently 1,100 feet away from the Property.  The study did not properly calculate the noise impact for when the new Interstate 69 — combined with Interstate 45 — is expanded and relocated *900 feet closer* to the Property. When the actual location of the freeway expansion is taken into account, the noise levels exceed 75 decibels, making the location "Unacceptable" under HUD's standards and under 24 C.F.R. § 51.103(c).  These facts are noticeably absent from the Ojala Noise Study and EA.

25.     The Ojala Noise Study is also fatally defective because it misrepresents the expected traffic count for the adjacent freeway corridor.  The Study should have measured the noise levels projected forward to 2040 after traffic from Interstate 45 is combined with traffic from with Interstate 69.  Instead of the anticipated 240,000 vehicles per day on Interstate 69 used in the Ojala Noise Report, the real number for the future combined Interstate 69 and Interstate 45 traffic, provided by TxDOT, is actually an anticipated 499,400 vehicles per day, more than double the amount in the Ojala Noise Study.  The need to assess the noise levels based on the combined traffic flow after the combination of Interstate 45 with Interstate 69 should have been readily apparent to the City, Turner and HHA, since the freeway expansion/combination was the entire underlying premise for TxDOT's purchase of Clayton Homes and source of proceeds that Defendants seek to spend.

26.     Atkinson has proven the falsity of the Ojala Noise Study with his own independent noise study by Marsh PML International, LLC.  This study properly takes into account the issues identified above and concludes that the correct DNL figure ranges between 77 to 80 dBA – well above the 75 dBA HUD limit.  The Marsh Study also rebuts the assertion in the Ojala Noise Study that gathering areas inside the Project will experience noise levels below 65

dBA; indeed, the Marsh Study shows how one courtyard corner will be impacted at a 76 DNL measurement.

27.     These failing noise standards would cause HUD to find the project "unacceptable," but because HHA, the City and Turner have not disclosed or even considered these material facts, Defendants' manipulation of the data will likely result in HUD approving the expenditure of public funds when, in fact, the Project does not qualify under HUD's standards and the Code of Federal Regulations.

**D.     The Property is adjacent to explosive and flammable hazards in violation of 24 C.F.R. Part 51, Subpart C.**

28.     HUD regulations also require HUD-assisted projects to have acceptable separation distances (ASD) from specific hazardous operations so as to minimize the degree of danger anticipated from explosion and fire.  24 C.F.R. § 51.200 *et seq*.  HUD will not approve an application for assistance for a proposed project located without an acceptable separation distance from a hazard unless appropriate mitigating measures are implemented or already in place.  24 C.F.R. § 51.202(a).  The Property violates these guidelines, because just 80 feet from one of its boundaries lie daily threats of accidental release of explosive and hazardous materials, and no mitigating measures are in place or appear to be planned for the Project.

29.     The Ojala Environmental Report states that "[n]one of the adjacent properties are involved in hazardous operations which include the use of fuels of an explosive or flammable nature."  It is not accurate to state that there are no hazardous operations involving fuels of an explosive or flammable nature adjacent to the Project.  Just 80 feet from the planned apartment building is the right of way for a double mainline railroad track which, on any given day, transports an average of 800 tank cars containing chemical, petrochemical and petroleum products.  Assuming that each tank car has a minimum capacity of 20,000 gallons, that would

mean that approximately 16,000,000 gallons of explosive/hazardous fluids will roll less than 100 feet from the Property on a daily basis.  A case study derived from the HUD Guidebook (which can be found in Appendix II in 24 C.F.R. Part 51.200) holds that the required ASD for a property close to a hypothetical 30,000 gallon liquid propane tank must 660 feet for explosions, 240 feet to protect buildings from fire and 1,150 feet to protect persons from fire exposure.  None of this is reflected in the reports provided to HUD, or the reports upon which the City and Turner rely to seek HUD approval for the Illegal Expenditure.

**E.     The Property Fails HUD's Environmental Justice Standards.**

30.     The term "Environmental Justice" is a concept arising from Executive Order 12898 which imposes on certain federal agencies, including HUD, the duty to consider how federally assisted projects may have disproportionately greater adverse human health or environmental effects on minority and low-income populations.  Accordingly, any environmental review record for a HUD-assisted project must contain descriptive evidence that: (a) the site or surrounding neighborhood does not suffer from adverse environmental conditions and the proposed action will not create an adverse and disproportionate environmental impact, or aggravate an existing, disproportionate adverse impact on minority or low-income populations; or (b) the project is not in an environmental justice community of concern (demographics, income, etc.) or does not disproportionately affect a low-income or minority population.

31.     The Ojala Report concludes that "the planned project is not expected to have disproportionately high and adverse human or environmental effects on minority and low income populations."  The City's FONSI notice, signed by the Mayor, incorporates this false claim as well.  These conclusions are flawed because they assessed area-wide diesel particulate matter levels, cancer risk, and respiratory analyses based on "Traffic Proximity" for the *existing* location of Interstate 69 – not the planned location for Interstate 69 which will be 900 feet *closer*

to the Property when completed.  As noted above, the Ojala Report also understates the traffic counts by more than half of what traffic patterns will be, and also completely overlooks the impact of "Hazardous Waste Proximity: 80-90 percentile for count of Transfer, Storage and Disposal Facilities divided by the distance."  The analysis also fails to take into account the impact of 800 rail cars each day transporting explosive and hazardous fluids immediately adjacent the Property, or the potential impact of tractor trailer carriage of explosive and hazardous materials down Interstate 69.  The reports shroud these important details from HUD.

**F.**     **The Property Fails HUD's Cumulative Impact Assessment in 24 C.F.R. § 58.32.**

32.     As part of the environmental review process for a new HUD development, the responsible entity must group together and evaluate as a single project all individual activities which are related either on a geographical or functional basis, or are logical parts of a composite of contemplated actions.  24 C.F.R. § 58.32(a).  The purpose of project aggregation is to group together related activities so that the responsible entity can, among other things, adequately address and analyze the separate and combined impacts of activities that are similar, connected and closely related, or that are dependent upon other activities and actions.  24 C.F.R. § 58.32(c)(1).

33.     Upon information and belief, the City, Turner and HHA have misled, or are misleading, HUD regarding the existing and future density of affordable/low income housing, in direct violation of the United States Supreme Court decision in *TDHCA v. Inclusive Communities Project, Inc.,* -- U.S. --, 135 S.Ct. 2507, 192 L.Ed.2d 513 (2015).  Specifically, the Ojala Environmental Report that Turner and the City have adopted claims that there are only three multifamily properties (Cleme Manor, Campanile at Commerce, and New Hope Housing Harrisburg) currently within a 1.5 mile radius of the Property and also refers to a planned "companion" project for up to 926 new apartments three blocks east on Buffalo Bayou.  The

City's Notice of Intent to Request Funds [**Exhibit 1**], the Ojala Environmental Report [**Exhibit 3**], and the City's Environmental Report [**Exhibit 5**] each materially misrepresent the existing concentration of affordable/low income housing within the 1.5 mile radius described above.  In fact, within the 1.5 mile radius, there are a total of nine additional affordable/low income apartments that already exist or are under construction/acquisition.  Thus, the neighborhood chosen for the Standard Jensen Project is already oversaturated with affordable/low income apartments.

**G.     Defendants have failed to identify suitable alternative development sites as required by 24 C.F.R. § 58.40 and 40 C.F.R. § 1508.9.**

34.     24 C.F.R. § 58.40(e) and 40 C.F.R. § 1508.9(b) both require the environmental assessment to examine alternatives to the project itself, including the alternative of doing nothing.  The City and Turner claim in the FONSI notice that there are no better alternatives to this Project when, in fact, there are.  The City and Turner make no effort to identify any other suitable development sites within the two-mile radius stipulated by TxDOT for replacement of at least 80% of the units in the former Clayton Homes.  In fact, there are multiple properties between two and thirty acres within the two-mile radius that could be developed or acquired for affordable/low income housing, with lower cost land and with better development attributes.

35.     The City and Turner have either already falsely certified to HUD, or are days away from falsely certifying to HUD, that all materials submitted in association with the application seeking approval for the Expenditure are "accurate, complete and not misleading." As shown above, that representation is itself false.

**H.     Defendants have failed to follow the procedural requirements set forth in 24 C.F.R. § 58.47 and 40 C.F.R. § 58.32.**

36.     On April 24, 2020, Atkinson provided his objections and public comments to HUD and the City.   Atkinson's objections outline new circumstances and environmental

conditions that affect the Standard Jensen Project and have a bearing on its impact, considering the concealed conditions discovered and as described in the evidence, as those terms are used in 24 C.F.R. § 58.47(a)(2).

37.     Once Turner and the City obtained those comments, they were required by law to: (a) consider the comments and make modifications, if appropriate, in response to the comments, before completing their environmental certification and before submitting their RROF to HUD, 24 C.F.R. § 58.43(c); and (b) re-evaluate their environmental findings to determine if the original findings are still valid and either affirm the original findings and update their environmental report records by including this re-evaluation and their determination based on its findings (if HHA and the City decide to move forward nonetheless) or prepare an environmental assessment or environmental impact statement (if the City and HHA determine that the original findings are no longer valid and there are potentially significant impacts that have not been considered). 24 C.F.R. § 58.47.   Under 24 C.F.R. § 58.47(b)(3), HHA was supposed to promptly notify the City and Turner of the new circumstances and environmental conditions Atkinson has uncovered.   Moreover, Chapter 392 of the Texas Local Government Code required requires HHA to spend its money to benefit the public generally, as well as occupants of the low income housing projects in particular.   *Housing Auth. of City of Harlingen v. State*, 539 S.W.2d 911 (Tex. Civ. App. – Corpus Christi 1976, writ ref'd n.r.e.).   In planning a housing project, including site location, a housing authority like HHA "shall consider the relationship of the project to a larger plan or long-range program for the development of the area within the housing authority." TEX. LOCAL GOV'T CODE § 392.052(g).

38.     The City, Mayor Turner and HHA have not complied with these statutes.   They have ignored Atkinson's comments and failed to re-evaluate the Standard Jensen Project.   Given

the fact that neither the City, Turner or HHA have substantively responded to Atkinson's objections and have not withdrawn or amended the March 2020 FONSI notice, it appears that Turner, the City and HHA intend to seek approval from HUD to make the Illegal Expenditure.

**Causes of Action**

**Count 1**
**Ultra Vires Action under Texas Law**

39.     Atkinson repeats and re-alleges each and every allegation made in the previous paragraphs as if fully rewritten herein.

40.     As shown above, HHA (as the Recipient), and the City (as the Responsible Entity) have a legal obligation both to: (a) consider Atkinson's comments and make modifications in response to the comments, before completing their environmental certification and before submitting their RROF to HUD, 24 C.F.R. § 58.43(c); (b) re-evaluate their environmental findings to determine if the original findings are still valid and either affirm the original findings and update their environmental report records by including this re-evaluation and their determination based on its findings (if HHA and the City decide to move forward nonetheless) or prepare an environmental assessment or environmental impact statement (if the City and HHA determine that the original findings are no longer valid and there are potentially significant impacts that have not been considered).  24 C.F.R. § 58.47.  Neither the City, Turner, nor HHA have done this.

41.     Neither HHA, the City, nor Turner have properly considered the interests of the public at large, as well as the future occupants of the planned Project.  HHA and, by extension, the City of Houston and Mayor Turner, are all acting without legal authority because, despite their actual knowledge of the facts (and the accompanying evidence in support), they have failed to reevaluate the environmental assessment as required by 24 C.F.R. § 58.32(d)(2) and/or 24

C.F.R. § 58.47 and failed to determine if the original findings are still valid. Instead, they continue to seek HUD's approval to spend millions in public funds when that expenditure will not meet HUD's standards and, thus, will be an illegal expenditure of public funds for which Atkinson, as a property taxpayer, has standing to sue and seek to prevent. *Hall v. McRaven*, 508 S.W.3d 232, 238 (Tex. 2017).

42.      As a result, Atkinson hereby sues for injunctive and declaratory relief. Atkinson seeks no damages against the City, Turner or HHA.

**Count 2**
**Declaratory Judgment**

43.      Atkinson repeats and re-alleges each and every allegation made in the previous paragraphs as if fully rewritten herein.

44.      An actual, justiciable controversy exists for which the Court may determine whether the City, Turner and HHA have met the legal requirements to seek approval from HUD to spend funds from the sale of Clayton Homes to purchase the land for the Standard Jensen Project and to determine whether such an expenditure would be a legal use of public funds. Accordingly, Atkinson, who qualifies as an interested party, requests a declaration holding that: (a) the City/Turner's RROF for the Standard Jensen Project is defective because it relies on a demonstrably inaccurate environmental assessment, which both the City and HHA have failed to reconsider after having been provided the facts and evidence that would cause any responsible entity to do so, as required by 24 C.F.R. § 58.47; and (b) Mayor Turner and/or the City may not seek HUD's approval to purchase the land for the Standard Jensen Project until they have, at a minimum, engaged in the process required by 24 C.F.R. § 58.43(a) and 24 C.F.R. § 58.47.

## Relief Sought

### Count 1
### Preliminary and Permanent Injunctive Relief

45.　　Atkinson repeats and re-alleges each and every allegation made in the previous paragraphs as if fully rewritten herein.

46.　　Atkinson will demonstrate a likelihood of success on the merits and that the balancing of equities favors the issuance of a preliminary and eventual permanent injunction against Defendants.　Unless Defendants are preliminarily and permanently enjoined from the conduct referenced below, Atkinson (and the public) will be irreparably damaged through the illegal expenditure of public funds.　Atkinson has no adequate remedy at law.　Should Defendants' actions continue unabated, they will have illegally spent public funds without having complied with the legal conditions precedent to the use of such funds.　The public's interest will be served by the issuance of the preliminary injunction.

47.　　Consequently, Atkinson requests a Preliminary and Permanent Injunction against the agents, servants, employees of the City and HHA, and those persons in active concert or participation with them who receive actual notice of the order by personal service or otherwise restraining the officials of the City and HHA from requesting permission from HUD to purchase the land for the Standard Jensen Phase I and II Project until they disclose to HUD all of the facts and evidence set forth in this pleading and engage in the process required by 24 C.F.R. § 58.43(a) and 24 C.F.R. § 58.47.

## <u>Claims in 4:20-cv-001895 – EaDo 800 Project</u>

### <u>Introduction</u>

48.     Contrary to Defendants' attacks branding Atkinson as a "not in my backyard" zealot, Atkinson has, for decades, championed responsible, respectful development for the residents of the neighborhood east of Downtown Houston.  Specifically, Atkinson has, for the last 23 years, pioneered environmental cleanup and responsible development of the Second and Fifth Wards east of U.S. Highway 59.  For instance, Atkinson: (a) prevented the destruction of the historic East end property known as the Myers-Spalti building (further known as El Mercado del Sol)[4] and Anson Jones elementary school and enhanced the neighborhood; (b) was instrumental in developing three affordable housing projects for low-income Houstonians (including the New Hope Housing Fifth Ward Housing Project on Nicholson Street and the McKee Street Project under construction one half mile west of Clayton Homes); (c) personally created Houston's second railroad quiet zone adjacent to Clayton Homes so that trains could not blast their horns in the middle of the night; (d) worked side by side with workers to tie steel and pour concrete to build three miles of Hike/Bike trails on both sides of Buffalo Bayou, on both sides of Clayton Homes, so that the children of Clayton Homes could access Guadalupe Park and Bruce Elementary School without crossing the dangerous railroad crossing at Runnels Street; (e) relocated former industrial and brownfield commercial operations in the Second and Fifth Wards and labored to clean up the land; (f) invested time, personal physical effort and his own resources to convert properties into usable parks, including the rescue of the City's Guadalupe Park from massive erosion failure.  For efforts like these, Atkinson was appointed to the eleven-member Houston Quality of Life Steering Committee, where he expanded his community service to

---

[4]     *See*     https://www.chron.com/business/article/Developer-plans-244-lofts-in-El-Mercado-building-2061388.php (last visited July 9, 2020).

projects across the Houston region (including providing aid to former Houston Mayors White and Parker in completing the Third Ward Columbia Tap bikeway trail).

49.     As evidenced by these and other efforts, Atkinson actually cares about the responsible development of the East End neighborhoods and has spent years of his life personally working to ensure that the neighborhood that surrounds the planned development site at issue in this case is developed in a responsible and visually pleasing manner.   Indeed, Atkinson has been recognized three times by the Houston Business Journal as a finalist in best development practices, including the most prestigious category for community service, Best Community Impact.

50.     Because he has also actively supported low income housing, Atkinson also cares about the responsible use of public funds to develop affordable housing so that the development will concomitantly benefit the residents and the surrounding neighborhood as a whole.   Atkinson expects public officials to take the regulatory process seriously, be honest when seeking the necessary regulatory approvals, and follow the required procedural process.   Atkinson opposes the use of public funds to force 1,100 disenfranchised residents to live: (a) atop and/or adjacent to polluted land the City of Houston itself contaminated for decades; (b) 200 feet from a massive, noisy freeway that will begin construction shortly; (c) 100 feet from a busy double-mainline track that every day carries hundreds of thousands of gallons of chemicals and explosion hazards; and (d) unlawfully packed into a neighborhood already oversaturated with low income housing in violation of federal law.   Though Defendants wish they could recycle their standard NIMBY arguments to hide their ongoing dereliction of duty, the facts in this case just don't permit it.

## Parties

51.     Plaintiff **Alan J. Atkinson** is an individual resident of the City of Houston, Texas who pays property taxes to the City of Houston and income taxes to the United States Treasury.

52.     Defendant **Tom McCasland** ("McCasland") is an individual who serves as the Director of, and therefore controls, the City of Houston's Housing and Community Development Department, which is the department which has been delegated the City's legal obligations with respect to the HUD-assisted housing projects at issue in this case.  Summons is not requested at this time.

53.     Defendant **LaRence Snowden** ("Snowden") is an individual who serves as the Chairman of the Board of Commissioners of, and who therefore controls, HHA.  Snowden is being sued in his official capacity only.  Snowden may be served with process at his office at 2640 Fountain View Drive, Ste. 400, Houston, Texas 77057, at his home at 3202 South MacGregor Way, Houston, Texas 77021, or wherever he may be found.

54.     Defendant **Mark Thiele** ("Thiele") is an individual who serves as the CEO and President of, and therefore controls, HHA.  Thiele is being sued in his official capacity only.  Thiele may be served with process at his office at 2640 Fountain View Drive, Ste. 400, Houston, Texas 77057, at his home at 2831 Durban Drive, Houston, Texas 77043, or wherever he may be found.

## Jurisdiction, Venue & Conditions Precedent

55.     Subject matter jurisdiction.   The Court has federal question subject matter jurisdiction because Atkinson asserts claims arising under federal law. 28 U.S.C. § 1331.  Specifically, Atkinson asserts a claim for prospective, injunctive relief under the *Ex Parte Young* line of cases to stop ongoing violations of federal law, as described below.  *See Freedom From Religion Found. v. Abbott*, 955 F.3d 417, 424 (5th Cir. 2020) ("[u]nder *Ex parte Young*, a litigant

may sue a state official in his official capacity as long as the lawsuit seeks prospective relief to redress an ongoing violation of federal law."). "It is beyond dispute that federal courts have jurisdiction over suits to enjoin state officials from interfering with federal rights." *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85 (1983). The Court has supplemental jurisdiction over Atkinson's claims that arise under state law. 28 U.S.C. § 1367.

56. <u>Personal Jurisdiction</u>. The Court has personal jurisdiction over Defendants as they reside in the State of Texas, they represent Texas governmental entities, and because they have purposefully established minimum contacts with the State of Texas sufficient to subject them to personal jurisdiction consistent with due process under the Fifth and/or Fourteenth Amendments to the United States Constitution, and the Court's exercise of jurisdiction over Defendants does not offend traditional notions of fair play and substantial justice.

57. <u>Venue</u>. Venue is proper in this division and district under 28 U.S.C. § 1391(b) because Defendants reside in this district, a substantial part of the events giving rise to the claims occurred in this division and district, and because the property that is the subject of the action is situated in this division and district.

58. <u>Conditions Precedent</u>. All necessary conditions precedent to the filing of the claims relating to the EaDo 800 Lofts Project have occurred, been waived or are futile.

<b><u>Standing</u></b>

59. Atkinson has worked for decades to preserve the orderly, responsible, sustainable and aesthetically pleasing development of the immediate neighborhood where the project is to be located. He also frequently uses for recreation the hike and bike trials that he helped build along Buffalo Bayou that meander right by the proposed development site and thus, he uses the area that will be affected by the challenged activity. Atkinson owns property a mere 200 yards from the proposed development site. As someone who has supported low income housing

development, Atkinson demands that the persons who control agencies that are tasked with complying with the federal law that governs the development of new HUD-assisted housing developments honestly disclose to HUD all material facts, while following all required federal procedures, when seeking HUD's approval for new housing developments.

60.     If Defendants are permitted to seek HUD approval for the project at issue,  while either actively misleading or failing to disclose the material facts to HUD about the suitability of the chosen project location, and while also shirking the mandatory re-evaluation procedures required by federal law, Atkinson will be harmed in a personal and individual way.  First, if HUD were to approve this project as currently planned (and as federal law says it generally will), that approval will adversely and materially impact Atkinson's desire to enjoy and recreate in an appropriately planned, vibrant, and esthetically pleasing neighborhood to which Atkinson has, for nearly 23 years, devoted countless hours and personal resources to develop and maintain for himself, his family and his neighbors.  *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 183, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000) (explaining that reduction of "aesthetic and recreational values" is an injury in fact).

61.     Second, allowing Defendants to mislead HUD into approving the project or to shirk their mandatory re-evaluation obligations would harm Atkinson's individual interests both as an owner of property 200 yards from the chosen project site and right to expect that local officials in charge of the agencies that have been delegated NEPA-based environmental assessment duties will be honest with HUD, consider all material facts, and adhere to the procedures required to fulfill their obligations, especially for the geographic areas in which Atkinson owns property and recreates.  In addition, allowing Defendants to mislead HUD and shirk their mandatory procedural obligations will cause Atkinson to suffer an individualized and

personal harm through the reduction of value and flexibility of use that Atkinson currently enjoys from ownership and use of the three-acre tract of land he owns just yards from the project at issue.  And if HUD approves the project after having been misled, the construction of the project would increase the population density and cause increased traffic, resulting in greater air and noise pollution which will be injurious to Atkinson's health, since he often recreates on the hike/bike trails he helped build.

62.    In addition, allowing Defendants to cause the agencies they control to continue misleading HUD into approving the project while shirking mandatory federal procedures will cause HUD to make an ill-informed decision and make a mockery of the public comment and re-evaluation process required by federal law.  If the agencies that Defendants control submitted a truthful EA, and followed the re-evaluation procedures before seeking HUD approval to spend $54,000,000 in public funds, an accurate, complete and not misleading submission would materially impact HUD's decision and thereby avert the damage to Atkinson's interests.  *Sierra Club v. FERC*, 827 F.3d 59, 67 (D.C. Cir. 2016); *see also Found. on Econ. Trends v. Lyng*, 943 F.2d 79, 83 (D.C. Cir. 1991).  Therefore, Atkinson has suffered an injury in fact that is fairly traceable to the challenged conduct of Defendants.

63.    A favorable judicial decision will also likely address Atkinson's injuries, because the decision will require stopping ongoing violations of federal law, require Defendants to follow federal law in the future, and require Defendants to cause the governmental entities they control to meet their obligations to provide accurate data to HUD so that it can, with its eyes wide open, decide whether to approve this land purchase and subsequent development and determine whether this housing project is in the best interests of the future residents, as well as the neighborhood in general, of which Atkinson is a material part.  It would also require Defendants

to cause the agencies they control to comply with mandatory procedural requirements set forth in greater detail below.  Redressability is clearly met.

64.     This case is not mooted by the fact that Atkinson may have already complained to HUD about his concerns.  Federal law requires that the governmental entities Defendants control must comply with federal requirements designed for the approval of new HUD-assisted housing projects; those are the agencies who qualify as the responsible entities and the recipients of federal HUD dollars, and Defendants are the persons in control of those agencies.  Just because Atkinson may have already registered some of his complaints with HUD is not a valid legal basis to excuse Defendants from meeting their legal obligations before spending millions of dollars of taxpayer funds on unsuitable land.

65.     Besides, there can be no assurance that Atkinson's earlier objections to HUD are complete or even effective to ensure that HUD has been provided all the material facts to consider.  The agencies Defendants control have all the relevant records and information; Atkinson does not.  While Atkinson has tried for months to obtain relevant public records from the agencies Defendants operate, to ensure that his objections were fully informed, the agencies Defendants control have either failed to produce, or have used procedural mechanisms under the Texas Public Information Act to avoid producing, the information Atkinson has requested so that he could provide comprehensive and fully supported objections to HUD.  That Atkinson was able to cobble together some objections does not moot the controversy, or excuse the governmental entities the Defendants control from meeting their federal obligations, which are designed, in part, to "ensure[ ] that the agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts," *DOT v. Pub. Citizen*, 541 U.S. 752, 768, 124 S.Ct. 2204, 159 L.Ed.2d 60 (2004) (quotation

omitted), while also ensuring that public housing development is done efficiently, effectively and responsibly to benefit not just the future residents, but the adjoining neighborhood as a whole. Requiring Defendants to ensure that the governmental entities they control meet their legal obligations to be honest with HUD about the suitability of the project site while following the mandatory procedures described below, would materially impact HUD's eventual decision on the proposed project. *Sierra Club v. FERC*, 827 F.3d 59, 67 (D.C. Cir. 2016); *see also Found. on Econ. Trends v. Lyng*, 943 F.2d 79, 83 (D.C. Cir. 1991) (explaining a typical NEPA plaintiff demonstrates standing by showing, inter alia, "that if the agency prepared an impact statement (and considered it) before implementing its plans, it might change its mind and thereby avert the damage to [the plaintiff's] interests").

66.     In short, Atkinson has suffered, and unless the Court provides relief, will continue to suffer an actual, imminent, concrete and particularized injury caused by Defendants' ongoing failures to comply with federal law outlined below, and a favorable judicial decision will redress, or at least minimize, that injury.

67.     Atkinson also has standing to sue under state law under *Andrade v. Venable*, 372 S.W.3d 134 (Tex. 2012) and its related predecessor cases, because: (a) Atkinson is a taxpayer who timely pays property taxes to the City of Houston and the United States Government; and (b) McCasland has in a RROF notice dated April 14, 2020, indicated his intent, on behalf of the City of Houston as a Responsible Entity and to benefit HHA as a recipient, to seek approval from HUD to spend $54,432,261.03 of public funds – clearly not a *de minimis* amount – to benefit HHA (as a Recipient of HUD financial assistance) to purchase two tracts of land totaling approximately 26.8 acres in Houston, Texas upon which to develop a public housing project that the City is calling the EaDo 800 Lofts Apartments Project without obtaining the ***informed***

consent of HUD, without following the mandatory procedures required by federal law, and while actively concealing or deliberately misrepresenting facts to HUD that, if disclosed, would lead to HUD's disallowance of the City of Houston's and HHA's request to spend $54,432,261.03 of public funds to purchase land unsuitable for public housing.  Moreover, Defendant Snowden has already violated federal regulations by spending nearly $1.8 million dollars of HUD funds on earnest money deposits for the land purchase before HUD ever gave approval to do so, which was a blatant violation of 24 C.F.R. § 51.22(a) that will continue if not enjoined by the Court.

### Ripeness

68.    This case is ripe.  By notice dated April 14, 2020, Defendant McCasland published the federally-mandated Combined Notice of Finding of No Significant Impact and Notice of Intent to Request Release of Funds for the EaDo 800 Lofts Project (EaDo 800 FONSI notice).  [**Exhibit 6**].  In that notice McCasland disclosed that he and the City would, on May 15, 2020, seek HUD's permission to purchase the land for the EaDo 800 Lofts project for more than $54,000,000.  Although federal law requires the materials upon which the EaDo 800 FONSI notice is based to be "accurate, complete and not misleading," the materials upon which the EaDo 800 FONSI Notice is based do not meet that standard.  Moreover, even though Atkinson and others have provided Defendants with evidence proving the existence of some of the material facts outlined in this pleading, McCasland has not responded to or considered Atkinson's objections and evidence, as required by federal law, or withdrawn or amended the EaDo 800 FONSI notice.  Moreover, Defendant Snowden has already caused HHA, the agency he oversees as the Chair of the Committee, to violate federal law by spending over 1.8 million dollars of federal money to make earnest money deposits for the land purchase before HUD approved the use of those funds.  In addition, neither Snowden nor Thiele have caused the governmental entity they control to meet its obligations under 24 C.F.R. § 58.32(d)(2) and 24

C.F.R. § 58.47(b)(3) to promptly inform the City of the new circumstances or environmental conditions Atkinson has outlined so that the City can re-evaluate the findings before proceeding.

69.     Defendants have already violated, and are continuing to violate, federal law by: (a) submitting, and not withdrawing, known false statements and omissions of material facts they have made to HUD; (b) failing to reconsider their environmental findings in light of the evidence Atkinson has submitted to them, as required by federal regulations; and (c) spending HUD funds before HUD has authorized those expenditures.   A dispute is deemed ripe when a party is thwarting the notice and comment periods proscribed by law.  *Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726, 733, 118 S.Ct. 1665, 140 L.Ed.2d 921 (1998); *Sierra Club v. U.S. Dep't of Energy*, 287 F.3d 1256, 1261–62 (10th Cir. 2002).  By definition, a responsible entity's failure to comply with NEPA's procedural requirements is an offense which is ripe at the time the failure is taking place, because that omission "can never get riper."  *Ohio Forestry*, 523 U.S. at 737, 118 S.Ct. 1665; *Fath v. Texas Dep't of Transp.*, 1:16-CV-234-LY, 2016 WL 7442868, at *9 (W.D. Tex. Sept. 6, 2016) (Yeakel, J.) (finding case ripe even when environmental review of challenged highway expansion project was not complete since plaintiffs were complaining of review procedure agency selected, which had already taken place).

## No Immunity

70.     No Eleven Amendment immunity.   Defendants lack Eleventh Amendment immunity.  Municipalities and their officers are not arms of the state and are not entitled to Eleventh Amendment immunity.  *Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89, 123 n.34, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984).  In addition, claims asserted under *Ex parte Young* are recognized exceptions to Eleventh Amendment immunity.  *Verizon Md. Inc. v. Public Serv. Comm'n of Md.*, 535 U.S. 635, 122 S.Ct. 1753, 152 L.Ed.2d 871 (2002).   Finally, Defendant McCasland has agreed to this Court's jurisdiction:

**ENVIRONMENTAL CERTIFICATION**

The City of Houston certifies to HUD that Tom McCasland, in his capacity as Director, consents to accept the jurisdiction of the Federal Courts if an action is brought to enforce responsibilities in relation to the environmental review process and that these responsibilities have been satisfied. HUD's approval of the certification satisfies its responsibilities under NEPA and related laws and authorities and allows HHA to use Program funds.

[**Exhibit 6**].

71. <u>No governmental immunity</u>. Defendants lack governmental or sovereign immunity. The *ultra vires* exception allows a plaintiff to sue a governmental official in his official capacity, thereby binding the governmental entity through its agent, for prospective injunctive and/or declaratory relief to restrain the government official from violating statutory or constitutional provisions. *City of El Paso v. Heinrich*, 284 S.W.3d 366, 369-76 (Tex. 2009). Governmental or sovereign immunity does not bar such claims. *City of Houston v. Houston Mun. Employees' Pension Sys.*, 549 S.W.3d 566, 576 (Tex. 2018) ("Even if a governmental entity's immunity has not been waived by the Legislature, a claim may be brought against a governmental official if the official engages in *ultra vires* conduct."); *City of Galveston v. CDM Smith, Inc.*, 470 S.W.3d 558, 563–64 (Tex. App.—Houston [14th Dist.] 2015, pet. denied) ("A suit asserting that a government officer 'acted without legal authority' and seeking to compel the official 'to comply with statutory or constitutional provisions' is an *ultra vires* suit" "not barred by governmental immunity").

**<u>Background Facts</u>**

**A.      Receipt of HUD Funds, NEPA and The Environmental Review Process.**

72. The same process required for the purchase of land for the Standard Jensen Project equally applies for the purchase of land for the EaDo 800 Lofts Project. Accordingly, Atkinson incorporates the allegations from Paragraphs 13-17 above. FED. R. CIV. P. 10(c).

**B.    The City's EaDo 800 FONSI notice.**

73.    Because 24 C.F.R. § 58.4 considers the City to be a "responsible entity" and HUD a grant recipient, its agent, Defendant McCasland caused the City to publish the EaDo 800 FONSI notice while the world was awash in chaos and fear amid the COVID-19 pandemic.  In that notice, the City's Housing and Community Development Department, which McCasland controls, disclosed that it would, on behalf of HHA, submit a request to HUD for the release of $54.4 million from the proceeds of the sale of Clayton Homes to TxDOT, so that HHA could purchase from private seller, Pinto East End, LLC, two tracts of land totaling 26.801 acres adjacent to Buffalo Bayou in Houston's Second Ward neighborhood to develop a new low income housing project the City calls "EaDo 800 Lofts Apartments." **[Exhibit 6]**.  The project is supposed to be built in two phases, with the first phase having 400 units in two multi-story buildings.  The EaDo 800 FONSI notice is legally insufficient because it offers no information about the second phase (which HUD must be able to consider for a full environmental analysis to have been undertaken), but later disclosures from HHA reflect that the additional phase[s] might add an additional 526 units, for a future total of 926 units on Tract 1.  The City's EaDo 800 FONSI notice says nothing about why it wants to spend federal tax dollars to buy the smaller 5.1-acre Tract 2 – except to note that "there are no current development plans for this portion of the Property as part of the EaDo 800 Lofts Phase I development."  One wonders why the City wants to spend federal tax money to buy land from a private developer that the City has no plans to use and, as shown below, *cannot* use for a public housing project since it is horribly polluted. The failure of the EaDo 800 FONSI notice to provide those details renders it insufficient under federal law.

**C.     The chosen site is either adjacent to contaminated land or horribly contaminated …
and getting worse.**

74.     24 C.F.R. § 905.602(d) requires any "proposed site to be newly acquired for a
public housing project" to meet certain standards.  One such standard requires the site to be "free
from adverse environmental conditions, natural or manmade."  *Id.* at § 905.602(d)(7).  HUD
policy also requires the environmental review of proposed multifamily locations to "include
evaluation of previous uses of the site and other evidence of contamination on **or near** the site, to
assure that occupants of proposed sites are not adversely affected by the hazards."  24 C.F.R. §
58.5(i)(2)(ii) (emphasis added).  To that end, "[p]articular attention should be given to any
proposed site on or **in the general proximity of** such areas such as dumps, landfills, industrial
sites, or other locations that contain, or may have contained, hazardous wastes." *Id.* at §
58.5(i)(2)(iii) (emphasis added).  And where, as here, the proceeds the public housing authority
proposed to use originate with the disposition of a former HUD-assisted project, HUD
regulations prohibit a grant recipient from using federal tax dollars to buy land that it cannot use
for public housing.  *See* 24 C.F.R. § 970.19(e)(2)(i) (outlining permissible uses of funds from the
disposition of HUD projects).  Despite all of these provisions, that is exactly what the agencies
that Defendants control are trying to do.

75.     McCasland's EaDo 800 FONSI notice admits that the smaller tract that HHA and
the City want to buy with public funds but not develop was "previously subject to unauthorized
landfill disposal activities."  Though one would not know it from reading the sparse EaDo 800
FONSI notice, the City and McCasland actually know quite a bit more about the "unauthorized
landfill disposal activities" on the smaller tract since it was the City itself that used the site as an
illegal dumping ground for the ashes from the City's former Velasco Incinerator, the remnants of

which sit on a 4.5-acre site just behind and east of the larger tract where the people, children and pets are supposed to reside.

76.     The 5.1-acre Tract 2 contained a landfill with ash up to 23 feet deep.  A clay cap was built to protect the contaminated ash from rain and Buffalo Bayou.  Page 39 of the City's 63-page Environmental Assessment falsely states that the "engineering control remains in place and the project is subject to annual inspections reported to the TCEQ."  One visit to the site aptly demonstrates the inaccuracy of this claim.  The ash pile is easily visible in multiple places, and cascades down the 23-foot bank, seeping into Buffalo Bayou, in clear contravention of what has been represented to HUD.

77.     Moreover, the City has actual knowledge that in the year 2000, the predecessor agency to the Texas Commission on Environmental Quality (TCEQ) reviewed an environmental analysis on the 5.1-acre Tract 2 that showed high levels of antimony, arsenic, chromium, lead, barium, beryllium, silver and cadmium in the soil and groundwater samples.  Presumably because of this study, the officials at HHA know full well that the smaller tract cannot be used for public housing purposes, as reflected in this September 5, 2019 text message between Defendant Snowden and former HHA President, Tory Gunsolley:



Despite the horrible contamination that the City itself perpetrated, McCasland has proposed that the City spend millions of federal tax dollars – **dollars that can only be used to build public housing** – to buy back the land the City knowingly contaminated, even when the governmental agencies that the Defendants control admit that the land cannot be used for public housing!

78.     The soil and groundwater contamination of Tract 2 is not the only problem with the site.  Immediately adjacent to the larger tract is a company called Lead Products, Inc., a lead processing facility that is registered with the EPA and TCEQ.  The EPA's records reflect that from 2009 to 2016, Lead Products had 129 separate releases of lead products into the air, and 144 separate surface water discharges of chemicals.  And since 2016, the EPA's records show that the emissions from Lead Products have been trending significantly higher.  [*See* https://echo.epa.gov/air-pollutant-report?fid=110000460689 (last visited May 21, 2020)].  As shown by the map pictured below, the larger Tract 1 is bordered by a contaminated ash dump on the west side, a lead smelter with increasing toxic emissions on the south side, and a 4.5-acre ash generator adjacent to it on the southeast side that has not been remediated:



Yet, for some undisclosed reason, the City wants to use public funds to buy contaminated land it not only admits it does not need and cannot use to provide housing, but that no responsible government should want to own, much less place 926 families to live upon.

**D.      The Site lacks sufficient traffic infrastructure, community amenities or schools.**

79.      <u>Inadequate traffic infrastructure</u>.  Federal law also requires a newly acquired, proposed public housing project site to be "adequate in size, exposure, and contour to accommodate the number and type of units proposed, and adequate utilities … and streets must be available to service the site."  24 C.F.R. § 905.602(d)(1).  Neither the Defendants, nor the government agencies they control, have performed or caused to be performed any traffic study to plan the transportation infrastructure necessary to support a development of this size, but Atkinson has.  In a preliminary traffic assessment completed May 6, 2020 by professional traffic engineers Voigt Associates, Inc., Voight concludes 5,043 daily automobile trips would be added to the neighborhood, which would overwhelm the existing, but woefully insufficient street grid, which contains narrow streets in material disrepair, is devoid of storm water improvements or sidewalks to facilitate safe movement for resident families and lacks sufficient right of way to widen or ameliorate these conditions in the future:

  

The increase in population density causing increased traffic, will also result in greater air and noise pollution, which will be injurious to Atkinson's health since he often recreates on the hike/bike trails he helped build.  A project of this size requires a full-blown traffic study, but Defendants have not caused the agencies they control to obtain one, apparently content instead to falsely claim in the Environmental Assessment to HUD (p. 24) that "[a]ll adverse environmental concerns have been fully mitigated through the use of engineering and institutional controls to

ensure the health and safety of the residents." That allegation is simply not true, nor is it fully supported, since the EaDo 800 FONSI notice does not even take into account the impact that Phase 2 will have on the health and safety of the residents.

80. _Bereft of community amenities._ A robust traffic plan will be paramount if HUD is duped into allowing this site to be used for the project. HUD Regulations also require public housing to be near amenities such as grocery stores, mass transit and pharmacies. While the City's application to HUD claims there are seven convenient grocery stores within one mile of the site, that statement is false. There are no full-service grocery stores within 1.9 miles of the site. Similarly, the nearest legitimate pharmacy is also 1.9 miles away. The nearest bus stop is approximately five blocks away. A two-mile hike, or even a five-block stroll, in the oppressive heat of August on streets with no sidewalks and 5,000 additional car trips a day seems like the absolute worst place to locate a new public housing development. Yet, this is what the agencies that the Defendants control want to do with over 50 million dollars of taxpayer funds, even when that development will violate the City's own Public Works development guidelines.

81. _Underperforming schools._ All federal housing guidelines prohibit the systematic concentration of low income and minority families in low opportunity areas with underperforming schools. The City's Environmental Assessment identifies three HISD schools that are expected to absorb the influx of students from the proposed project but of those three schools, only one – Burnet Elementary – qualifies as sufficient. The Texas Education Agency rates Navarro Middle School and Wheatley High School as having an accountability rating of "D" and "F" respectively. Apparently, sending the children of minority and low income families to some of the worst performing schools in the entire state is just fine with the agencies that the

Defendants control – which seems a rather hypocritical position since Defendant McCasland was quoted by the Houston Chronicle as saying this in March 9, 2018:

> "There's been a strong focus on making sure that deals are not going directly into neighborhoods that have a high poverty concentration," McCasland said. "There's a very high priority on making sure family developments are located next to amenities, whether those be transit amenities or, more importantly, high-performing schools."

**E.     The cost for the project is prohibitive.**

82.     The City claims the total project cost for Phase 1 is expected to be $131,382,209.03.  After removing the flood plain land from the 21.7-acre Tract 1, approximately half of the land available for development will be used for Phase 1, and dividing the unit cost for the first 400 apartments in Phase 1 will be $260,000 per unit.  But back in 2016, Mayor Turner rejected a public housing project near the Galleria that cost $240,000 per unit, claiming that project's price tag was too expensive.  [*See* https://www.houstonchronicle.com/business/real-estate/article/Mayor-comes-out-against-housing-project-near-9020777.php (May 22, 2020)].

**F.     The chosen site perpetuates unlawful packing in violation of Supreme Court Precedent and HUD regulations.**

83.     In October 2019, when Mayor Turner lobbied HUD to permit the sale of Clayton Homes to TxDOT, he represented to HUD that the governmental agency that Defendants Snowden and Thiele control will use the proceeds from the sale to "develop replacement units in neighborhoods throughout the city:"

> HHA has indicated that they plan to use the sale proceeds to develop replacement units in neighborhoods throughout the city. I strongly support this approach, as it will provide our residents greater choice and the chance to move into high-opportunity neighborhoods with improved access to schools, jobs, and other community resources.
>
> In closing, I urge you to approve this application, as it will allow us to replace some of our city's most distressed public housing and provide superior housing options for low-income Houstonians.

This position made sense given that the Supreme Court held in 2015 that concentrating public housing in areas with high poverty and crime rates with little access to good schools and transit violates federal housing laws. *TDHCA v. Inclusive Communities Project, Inc.*, -- U.S. --, 135 S.Ct. 2507, 192 L.Ed.2d 513 (2015). But rather than intersperse the replacement projects throughout the City, as Mayor Turner said he "strongly supported," the governmental agencies that the Defendants control now appear to have abandoned that approach, as the City and HHA propose to use <u>all</u> of the Clayton Homes proceeds on the land purchase for the Standard Jensen and Eado 800 Lofts Projects – two projects in the same neighborhood within 3,000 feet of one another. To perpetuate this unlawful policy, the City materially misrepresents the existing concentration of affordable/low income housing within the 1.5-mile radius described above, claiming that there are only three public, multifamily properties within a 1.5-mile radius of the Property when, in fact, a total of nine additional affordable/low income apartments already exist or are under construction/acquisition:

| Name of Project | Location compared to Property |
|---|---|
| Kennedy Place | Three blocks east at 3100 Gillespie |
| Kelly Village | Five blocks north at 3118 Green |
| Canal Street Apartments | Five blocks southwest at 2104 Canal |
| New Hope Housing – 2nd Ward | Three blocks south at 2821 Canal |
| The Circuit Apartments | One mile south at 2424 Capitol |
| The Exchange at Hardy Yards | 1.5 miles west at 1250 Leona |
| The Hardy Yard Apartments | 1.25 miles west at 1550 Leona |
| McKee City Living | 0.5 miles west at 650 McKee |
| The Marquis Apartments | One block south at 2115 Runnels |

In yet another misrepresentation, the Environment Assessment the City sent to HUD claims the neighborhood is "dense," apparently to support the baseless assumption that an additional 926 households will not have a major impact. The facts show otherwise. The entire Second Ward has just around 5,600 households, and in the immediate neighborhood, there are no more than 250 units within the area bounded by Jensen to the West, Navigation to the North and East and

Buffalo Bayou to the north.  Adding the proposed 926 units is a 17% increase in the total households in the entire Second Ward and a four-fold increase in the immediate neighborhood. Even just the first phase of 400 units will nearly double the number of households in the immediate neighborhood, and that density calculation does not include the additional 400 units that will be added if the Standard Jensen project proceeds.  The governmental agencies Defendants control are proposing to continue their unlawful "packing" of public housing in an area that has failing schools, insufficient mass transit, and an infrastructure that cannot support a project of this scope, which would be unlawful under the Supreme Court's decision in *Inclusive Communities Project*.  Though the agencies that Defendants control are now in possession of this evidence, they persist in their efforts to obtain HUD approval without disclosing these material facts, and without re-evaluating the project in light of these material discoveries, yet another ongoing violation of federal law.

**G.** **Defendants have failed to identify suitable alternative development sites as required by 24 C.F.R. § 58.40 and 40 C.F.R. § 1508.9.**

84.    24 C.F.R. § 58.40(e) and 40 C.F.R. § 1508.9(b) both require the environmental assessment to examine alternatives to the project itself, including the alternative of doing nothing.  The EaDo 800 FONSI notice claims that there are no better alternatives to this Project when, in fact, there are.  Specifically, the entity McCasland controls makes no effort to identify any other suitable development sites for replacement of at least 80% of the units in the former Clayton Homes.  In fact, there are multiple properties between two and thirty acres that could be developed or acquired for affordable housing, with lower cost land and with better development attributes.  Ironically, the City rejected a 35-acre property at 3617 Baer Street for affordable housing development because it violated HUD overconcentration guidelines for this neighborhood, which makes one wonder why the governmental agencies the Defendants control

now believe that the EaDo 800 Lofts Project will not lead to an unlawful overconcentration in violation of federal law.

85.     Even with the actual knowledge of all of these issues, McCasland concludes in the EaDo 800 FONSI notice and Environmental Assessment that "the project will have no significant impact on the human environment and thus, a comprehensive Environmental Impact Study required under NEPA is not required."  Given the ultimate scale of this Project, and its proposed location adjacent to active lead processing facility in a former industrial zone known to contain hazardous wastes, McCasland's conclusion to forego an Environmental Impact Statement is troublesome, especially since McCasland has falsely certified to HUD that all materials submitted in association with the application seeking approval for the land purchase are "accurate, complete and not misleading."

**H.     Snowden, and the governmental entities that he and McCasland control, have already violated federal law.**

86.     Federal regulations prohibit a recipient of financial assistance from HUD, or any participant in the development process of a HUD-assisted project (including public or private nonprofit or for-profit entities or any of their contractors), from spending HUD-controlled funds before HUD has approved the recipient's RROF.  24 C.F.R. § 51.22(a).  In violation of this regulation, Snowden caused HHA to spend nearly $1,800,000 of the Clayton Homes sales proceeds to make a non-refundable[5] earnest money deposit for the Property, and then extend the closing date for the land purchase contract well before an application was submitted to HUD requesting approval for this use of the Clayton Homes proceeds.  A September 5, 2019 text

---

[5]    Real estate industry operatives sometimes call the payment of a non-refundable earnest money deposit as "going hard" on the earnest money.

message between former HHA President, Tory Gunsolley, and Defendant Snowden shows the first $300,000 payment at 800 Middle Street, another name used to denote the EaDo 800 Project:



On September 10, 2019, the title company confirmed receipt of a $100,000 wire transfer for an "additional earnest money deposit for the Eado Deal":



And another text message between Snowden and former HHA President Gunsolley on September 25, 2019 confirms that the total nonrefundable earnest money deposit of $300,000 has already been paid to the landowner, Pinto:

Since then, Atkinson has discovered that HHA spent without HUD approval another $1,500,000 in federal funds to extend the closing date of the land purchase contract with the seller.

87.     Defendants' blatant violation of a bedrock regulation shatters any illusion of integrity that the agencies the Defendants control hope to manufacture with the false FONSI notice and Environmental Assessment, and illustrates exactly why immediate, irreparable harm will result to taxpayers absent judicial relief.

## I.     Defendants have ignored these facts despite the federal requirement that they assess and modify their proposal.

88.     On May 14, 2020, Atkinson provided to the City what objections and public comments he could muster, even despite the absence of numerous public records that Atkinson had been seeking from the governmental agencies the Defendants control.   Once the governmental entities Defendants control obtained those comments, federal regulations required them to: (a) consider the comments and make modifications, if appropriate, in response to the comments, before completing their environmental certification and before submitting their RROF to HUD, 24 C.F.R. § 58.43(c); and (b) re-evaluate their environmental findings to determine if the original findings are still valid and either affirm the original findings and update their environmental report records by including such re-evaluation and their determination based on its findings (if HHA and the City decide to move forward nonetheless) or prepare an environmental assessment or environmental impact statement (if the City and HHA determine that the original findings are no longer valid and there are potentially significant impacts that have not been considered).   24 C.F.R. § 58.47.   Although Defendants have had more than two months to do so, there is no indication that the Defendants have caused the governmental entities they control to perform these tasks.   They have not responded to Atkinson's comments and objections, nor have they withdrawn or amended the EaDo 800 FONSI notice.   As a result, it appears that Defendants have caused, and will continue to cause, the governmental agencies they control to press forward with seeking approval to make the Illegal Expenditure, notwithstanding

the misrepresentations to HUD, the existing and ongoing violations of federal law, and the failure to comply with the re-evaluation process required by federal law.

**Causes of Action**

**Count 1**
***Ex Parte Young***

89.     Atkinson repeats and re-alleges each and every allegation made in the previous paragraphs as if fully rewritten herein.

90.     As discussed above, the City of Houston is the Responsible Entity when it comes to the EA and related procedural requirements, while HHA is the Recipient of HUD assistance. Both governmental entities have responsibilities under those laws.  McCasland is the head of the City department to which the City delegated the City's obligations as a responsible entity, and, indeed, McCasland was the signatory of the City's EaDo 800 FONSI notice.  He therefore has the duty to ensure that the City complies with all legal obligations as a responsible entity seeking to obtain approval to spend HUD assistance on a new public housing development.  Section 2-292(b) of the Houston City Ordinances provides that the director of the City's Housing and Community Development Department "shall be the executive officer of the department and shall perform or cause to be performed the duties that are assigned by law …".  Section 2-293 of the City's Ordinances outline the duties of the Director, which include, among others: (1) administration of the community development block grant program; (2) administration of all city housing programs (except those administered by the housing authority of the City of Houston) including replacement housing; (3) coordination with the housing authority of the City of Houston to assure the effective development of public housing; and (4) rendering support services for the well-being of the citizens of the city in the areas of aesthetic environment, natural resources utilization and other matters affecting the quality of life.  Therefore, Defendant

McCasland is proper defendant for an Ex Parte Young case and has the requisite connection with the conduct Atkinson is challenging since he has the requisite connection to the ongoing violations of federal law outlined below and is the person who has authored the insufficient EaDo 800 FONSI notice.

91.     The HHA is operated by a Board of Commissioners.  Snowden is the Chairman of the HHA's Board of Commissioners, while Thiele is the top executive officer of HHA.  Under Section 2 of the Bylaws of the Houston Housing Authority, "[t]he actions of the Chair shall at all times be in compliance with all applicable federal, state and local laws."  [**Exhibit 7**].  Under Section 4(c) of the Bylaws, the Secretary of the Board of Commissioners shall also be the President and CEO of the Houston Housing Authority, and have general supervision over the administration of the business and affairs of the Houston Housing Authority, subject to the direction of the board of commissioners. [*Id.*].  The President and CEO shall implement such procedures as are necessary to carry out and enforce board policies and shall be charged with the management of the housing developments of the Houston Housing Authority and shall act in accordance with all applicable federal, state, and local laws."  [*Id.*].  Accordingly, Snowden and Thiele have the primary obligation to ensure that HHA meets its obligations as a recipient of HUD assistance to develop the EaDo 800 Lofts Project.  Accordingly, Snowden and Thiele, by virtue of their offices, have the requisite connection with the conduct Atkinson is challenging.

92.     The governmental agencies that Defendants control are involved in ongoing violations of federal law which include, among others outlined above: (a) the continued expenditure of federal funds before obtaining the required approvals from HUD as required by 24 C.F.R. § 58.43(c) and 24 C.F.R. § 51.22(a); (b) the continued failure to provide to HUD materials about the EaDo 800 Loft Project that are "accurate, complete and not misleading," and

(c) Defendants' ongoing campaign to ignore Atkinson's comments and failure to re-evaluate the project in light of those comments, as required by 24 C.F.R. § 58.32(d)(2) and 24 C.F.R. § 58.47.

93.       "The Supreme Court's recent *Ex parte Young* jurisprudence explains that the inquiry into whether a suit is subject to the *Young* exception does not require an analysis of the merits of the claim." *City of Austin v. Paxton*, 943 F.3d 993, 997–98 (5th Cir. 2019) (citing *Verizon Md., Inc.*, 535 U.S. at 646).  Rather, "a court need only conduct a straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective." *Id.*  As shown above, this complaint meets that straightforward inquiry.

## Count 2

### *Ultra Vires* claim under Texas Law

94.       Chapter 392 of the Texas Local Government code regulates the conduct of Housing Authorities like HHA through the "Housing Authorities Law" ("HAL") because HHA is created under, and gets its authority from, HAL.  TEX. LOCAL GOV'T CODE § 392.001 *et seq.*; TEX. LOCAL GOV'T CODE § 392.011(a).  Under HAL, "the property of an authority is public property used for essential public and government purposes." *Id.* at § 392.005(a).  HHA is required to expend its funds in a manner that will benefit the public generally, as well as the occupants of the low income housing projects in particular.  *Housing Auth. of City of Harlingen v. State*, 539 S.W.2d 911 (Tex. Civ. App. – Corpus Christi 1976, writ ref'd n.r.e.).  In planning a housing project, including site location, a housing authority like HHA "shall consider the relationship of the project to a larger plan or long-range program for the development of the area within the housing authority."  TEX. LOCAL GOV'T CODE § 392.052(g).

95.     As shown above, HHA and the City, as the responsible entities,[6] have a legal obligation to both: (a) consider Atkinson's comments and make modifications in response to the comments, before completing their environmental certification and before submitting their RROF to HUD, 24 C.F.R. § 58.43(c); (b) re-evaluate their environmental findings to determine if the original findings are still valid and either affirm the original findings and update their environmental report records by including such re-evaluation and its determination based on their findings (if HHA and the City decide to move forward nonetheless) or prepare an environmental assessment or environmental impact statement (if the City and HHA determine that the original findings are no longer valid and there are potentially significant impacts that have not been considered).  24 C.F.R. § 58.47.  Defendants have not caused the governmental agencies they control to perform these legally required tasks, but instead, those entities continue to press forward with seeking approval to make the Illegal Expenditure.

96.     HHA and the City have clearly failed to comply with these statutes, instead acting as puppets for private interests hoping to use public funds to manufacture a windfall from the sale of undesirable land.  Defendants have failed to properly consider the interests of the public at large, as well as the future occupants of the planned Project.  Defendants hope to cause their agencies to secretly push this horrible waste of taxpayer money through the pipeline while the public's attention is diverted by the COVID-19 Pandemic, and enrich private citizens (including the spouse of a county commissioner and the former head of the HHA) at the expense of those whom both the City and HHA, and by extension, Defendants, are duty-bound to protect – the public at large, and the future occupants of the housing project under consideration.

---

[6]     24 C.F.R. § 58.2(a)(7) defines "Responsible Entity" to mean, with respect to environmental responsibilities, a recipient of HUD-assisted funds (like HHA), and for public housing agencies, the unit of general local government within which the project is located that exercises land use responsibility.  In its Environmental Assessment, the City has already admitted that it is the Responsible Entity, while HHA is the grant recipient.

97.     HHA and, by extension, the City of Houston and Defendant McCasland, are all acting without legal authority because, despite their actual knowledge of some of the material facts outlined herein (and the accompanying evidence in support) Atkinson provided to them as early as January 16, 2020 and again on May 14, 2020, they have failed to reevaluate the environmental assessment as required by 24 C.F.R. § 58.32(d)(2) and/or 24 C.F.R. § 58.47 and failed to determine if the original findings are still valid.  Instead, they continue to seek HUD's approval to spend $54,000,000 in public funds when that expenditure will not meet HUD's standards.  Texas law grants Atkinson the standing to sue and, hopefully, prevent.  *Hall v. McRaven*, 508 S.W.3d 232, 238 (Tex. 2017).  Consequently, Atkinson hereby sues Defendants in their official capacities to obtain prospective injunctive and declaratory relief described below. Atkinson seeks no damages against Defendants.

## Count 3

### Declaratory Judgment

98.     Atkinson repeats and re-alleges each and every allegation made in the previous paragraphs as if fully rewritten herein.

99.     A justiciable controversy exists between the parties for which the Court may provide a declaratory judgment under TEX. CIV. PRAC. & REM. CODE § 37.004 to determine whether Defendants have met the legal requirements to seek approval from HUD to spend funds from the sale of Clayton Homes and to determine whether such an expenditure would be a legal use of public funds.  Accordingly, Atkinson requests a declaration under the Federal Declaratory Judgment Act holding that: (a) the EaDo 800 FONSI notice is defective because it relies upon a demonstrably inaccurate and incomplete environmental assessment, which the Defendants have failed to require the governmental entities they control to reconsider as required by 24 C.F.R. § 58.47; and (b) Defendants may not permit the governmental entities they control to seek HUD's

approval for the use of any portion of the funds from the sale of Clayton Homes until they have, at a minimum, amended the required FONSI notice so that it truly is accurate, complete and not misleading, and engaged in the process required by 24 C.F.R. § 58.43(a) and 24 C.F.R. § 58.47.

**Relief Sought**

**Count 1**
**Preliminary and Permanent Injunctive Relief**

100.    Atkinson repeats and re-alleges each and every allegation made in the previous paragraphs as if fully rewritten herein.

101.    Atkinson will, at the hearing, demonstrate a likelihood of success on the merits and that the balancing of equities favors the issuance of a preliminary and eventual permanent injunction against McCasland, Snowden and Thiele, and those acting in concert with them. Unless these officials are preliminarily and permanently enjoined from the conduct referenced below, Atkinson (and the public) will be irreparably harmed.  Atkinson has no adequate remedy at law since prospective injunctive relief is the only remedy allowed.  An injunction that requires officials to comply with the law would serve the public's interest, because the public's interest is always served by forcing municipal officials to comply with applicable law.  For purposes of an injunction "the public interest always is served when public officials act within the bounds of the law and respect the rights of the citizens they serve.").  *Nobby Lobby, Inc. v. City of Dallas*, 767 F.Supp. 801, 821 (N.D. Tex. 1991), *aff'd*, 970 F.2d 82 (5th Cir. 1992).  That is really the only relief Atkinson requests.  Should Defendants' actions continue unabated, they will have illegally spent public funds without having complied with the mandatory conditions precedent that federal law requires.

102.    **This is the why this case requires immediate judicial relief.**  In the absence of any receipt of objection to the contrary, HUD will assume that what it has been told by the

responsible entity is true, and will approve the Request for Release of Funds.  24 C.F.R. § 58.72.

At that point, the City and HHA are free to spend the money and buy the contaminated land.  "In

cases in which HUD has approved a certification and RROF but subsequently learns (e.g.,

through monitoring) that … the recipient or responsible entity otherwise failed to comply with a

clearly applicable environmental authority," HUD can take away its approval and disallow the

project to move forward.  24 C.F.R. § 58.72(c).  By that point, however, the 54 million dollars

will have been spent, with no recourse for the City to get the money back once the land purchase

closes, and the City will have spent 54 million dollars to buy land that is not suitable for public

housing.  Because HUD can pull its approval for a project once it learns it has been lied to, it is

vitally important that the submissions to HUD be scrupulously accurate, complete and not

misleading.  But, as shown above, they are not accurate, and it is HUD's assumption of accuracy,

coupled with the collective misrepresentations and omissions about the Projects, that threaten

irreparable harm through the potential waste of millions of dollars in taxpayer funds.

103.    Consequently, Atkinson requests a Preliminary and Permanent Injunction against

McCasland, Snowden and Thiele in their official capacities, as well as against their agents,

servants, employees, and those persons in active concert or participation with them who receive

actual notice of the order by personal service or otherwise, that:

(a)    restrains them, and those identified above, from requesting permission from HUD to purchase the land for the EaDo 800 Project until they cause the governmental agencies they control to fully disclose to HUD all of the facts and evidence set forth in this pleading so that the submissions to HUD are accurate, complete and not misleading, and engage in the process required by 24 C.F.R. § 58.43(a) and 24 C.F.R. § 58.47;

(b)    restrains them, and those identified above, from using any funds obtained from the sale of Clayton Homes in violation of 24 C.F.R. § 51.22(a) unless and until Defendants prove compliance with the conditions outlined in Paragraph 102(a) above.

DATED:  July 10, 2020                    Respectfully submitted,

                                         By: */s/ Stewart Hoffer*
                                             **Stewart Hoffer (Atty in Charge)**
                                             SDTX No. 20123
                                             Texas Bar No. 00790891
                                             shoffer@hicks-thomas.com
                                             **Kasi Chadwick**
                                             SDTX No. 2421911
                                             Texas Bar No. 24087278
                                             kchadwick@hicks-thomas.com
                                             **HICKS THOMAS LLP**
                                             700 Louisiana, Suite 2300
                                             Houston, Texas 77002
                                             Telephone: (713) 547-9100
                                             Facsimile: (713) 547-9150

                                         **Attorneys for  Atkinson Alan J. Atkinson**


                                **Certificate of Service**

        I hereby certify that on July 10, 2020, the foregoing document was served via CM/ECF on the following counsel of record:

| | |
|---|---|
| Richard A. Morris | Ronald C. Lewis |
| Alexa Gould | Suzanne Chauvin |
| Rogers Morris & Grover LLP | M. Lucille Anderson |
| 5718 Westheimer, Suite 1200 | City of Houston Legal Department |
| Houston, TX 77057 | PO Box 368 |
| rmorris@rmgllp.com | Houston, TX 77001-0368 |
| agould@rmgllp.com | Mlucille.anderson@houstontx.gov |
| | Ronald.lewis@houstontx.gov |
| **Attorneys for Houston Housing Authority** | Suzanne.chauvin@houstontx.gov |
| | **Attorneys for Mayor Turner and City of Houston** |


                                         */s/ Stewart Hoffer*
                                         **Stewart Hoffer**